Motion for Rehearing Granted in Part and Overruled in Part; Affirmed in
Part and Reversed and Remanded in Part; Opinion of October 3, 2006 Withdrawn;
and Opinion on Rehearing filed April 27, 2007








Motion for Rehearing Granted in Part and Overruled in
Part; Affirmed in Part and
Reversed and Remanded in Part; Opinion of October 3, 2006 Withdrawn; and
Opinion on Rehearing filed April 27, 2007.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-00484-CV

_______________

 

7979 AIRPORT GARAGE, L.L.C., Appellant

 

V.

 

DOLLAR RENT A CAR SYSTEMS, INC., Appellee

                                                                                   
                                                            

On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 02-27571

                                                                                               
                                                

 

O P I N I O N    O N    R E H E A R I N G

We grant appellant=s motion for rehearing in part,
overrule it in part, withdraw our opinion of October 3, 2006, and issue this
opinion on rehearing.  








In this action on a commercial lease,
the parties dispute whether the lease requires costs that certain repairs to a
parking garage be paid by the property=s owner, 7979 Airport Garage, L.L.C.
(A7979@), or the lessee, Dollar Rent A Car
Systems, Inc. n/k/a DTG Operations (ADollar@).  Appellant 7979 argues that the
evidence is legally and factually insufficient to support the jury=s verdict in Dollar=s favor on its claims for breach of
contract, breach of the implied warranty of suitability, and damages.  7979
argues alternatively that either Dollar or the prior owner of the parking
garage is responsible for the costs of repairs, and that Dollar is estopped
from asserting its claims against 7979.  Finally, 7979 contends the trial court
erred in awarding unsegregated attorneys= fees to Dollar, and that, in any
event, the fees are excessive.  We conclude that the lease unambiguously
requires 7979 to pay for the repairs at issue, and thus, Dollar may recover its
actual damages and the attorneys= fees it incurred to defeat 7979=s counterclaims and recover on the
contract.  We therefore affirm the portion of the judgment incorporating the
jury=s finding that 7979 is liable to
Dollar for actual damages in the amount of $16,037.20, and that Dollar is not
liable to 7979.  But because Dollar failed to segregate the attorneys= fees it incurred in prosecuting its
breach of contract claim and defending against 7979=s counterclaims from those fees it
incurred solely in connection with its breach of warranty claim, we reverse the
portion of the judgment awarding attorneys= fees, sever this issue from the
remainder of the judgment, and remand  this issue to the trial court for
further proceedings consistent with this opinion.  In light of our disposition
of this issue, we do not reach 7979=s claim that the fee award is
excessive. 

I.  Factual
and Procedural History

Dollar operates a car rental agency
and three-story parking garage (the AGarage@) near Hobby Airport on premises
formerly leased from ARE Holdings, L.L.C. d/b/a Parking Company of America (APCA@).[1] 
The fifteen-year Lease provides in pertinent part:








17.a.    Lessor shall keep the foundation, the
exterior walls (except plate glass windows, doors, door closure devices, window
and door frames, molding, locks and hardware and painting or other treatment of
the interior surface of exterior walls) and roof (excepting any leaks or damage
caused by Lessee, Lessee=s employees or agents) of the Leased Premises in good
repair except that Lessor shall not be required to make any repairs occasioned
by the act or negligence of Lessee, Lessee=s
agents, employees, subtenants, licensees, invitees, customers and
concessionaires, which repairs shall be made by Lessee.  In the event that the
Leased Premises should become in need of repairs required to be made by Lessor
hereunder, Lessee shall give immediate written notice thereof to Lessor and
Lessor shall not be responsible in any way for failure to make any such repairs
until a reasonable time shall have elapsed after delivery of such written
notice.

 

17.b.    Lessee
shall keep the Leased Premises in good repair and condition and shall at Lessee=s sole cost and expense, make all
needed repairs and replacements, including replacement of cracked or broken
glass, except for repairs and replacements required to be made by Lessor herein
and shall keep all plumbing units, pipes and connections free from obstruction
and protected against ice and freezing. During the Lease Term, Lessee shall
keep the Leased Premises, including the floors of the Garage, clean, neat, and
orderly and free from all grease, oil, ashes, dirt and other refuse or matter. 
Lessee shall make no alterations or additions without obtaining the prior
written consent of Lessor which shall not be unreasonably withheld.  Any
addition to, or alteration of the Leased Premises, except movable furniture and
removable trade fixtures, shall become at once a part of the Garage and belong
to the Lessor.  If any repairs required to be made by Lessee are not made
within fifteen (15) days after written notice is delivered to Lessee by
[L]essor, Lessor at Lessor=s option may make such repairs.  Lessee shall pay to Lessor
the reasonable cost of such repairs within thirty (30) days after receipt of
[the] bill for repairs.

PCA paid for temporary repairs to the
expansion joints in the building in 1998 and 2000.  As engineer Henry Segura
explained: 

[Expansion joints are gaps left in
the concrete floor of the building] to remove stress build-up due to
temperature growth of the building.  This growth, or elongation can tear a
building apart, unless properly accounted for.  An air gap that offers no
resistance to elongation load makes an excellent method of elimination of
stress.  Vertical load transfer at an expansion joint, then becomes very
important in the design of a successful joint.  








The expansion joints divide the
Garage in a north-south direction near the center of the building.  The 1998
repairs were considered temporary because Anot all design information [was]
properly documented at that time.@  The engineer supervising the
repairs stated that the repair Amay be used for an extended period, but should be monitored
for elongation, etc.@

In December 2000, Dollar negotiated
with PCA to buy the Garage for $5.55 million.  As a prospective purchaser,
Dollar retained the engineering services of Walter P. Moore & Associates,
Inc. (AMoore@) to survey the Garage and state its
opinion Aon the [Garage=s] current overall structural
condition . . . .@  On December 26, 2000, Moore produced its findings in a
Structural Due Diligence Review (the AMoore Report@).  Under the heading AObservations B Structural,@ the Report states:

Repair/Replace
existing transverse expansion joint:  Significant deterioration of both the
concrete and the expansion joint material on Levels 2 and 3 is visible. 
Previous repair attempts were not installed properly and are not currently
functioning as needed.  Problem conditions with these expansion joints include:
loose and spalled concrete, loosened nuts for the bolts attaching the angles to
the concrete deck, wallowed bolt holes in the concrete deck, and torn and
separated expansion joint material over the joint itself.  The entire expansion
joint system should be thoroughly reviewed and we anticipate that the repairs
would include: proper attachment of the load transfer angles, replacement of
the damaged expansion joint material and repair of unsound concrete.            

The Moore Report advised that this
project Ashould be addressed immediately or
within 1 year.@  Dollar promptly sent the report to PCA and to Scott Word, PCA=s real estate broker.

On or about January 5, 2001, Dollar
received a proposal from Kirkconnell Maintenance to perform the recommended
work (the AKirkconnell Estimate@).  According to the Kirkconnell Estimate, the following four
services were required to remedy the problems with the expansion joints: 

Service 1:                               Replace Wide
Joints at two levels[,] complete width of garage  $16,500.00

Service 2:                               Repair concrete
decks at the above joints $12,000.00

Service 3:                               Repair
Column-light pole detail at same joint $7,500.00








Service 4:                               Remove
existing [sic] and Install Anti Deflection System at same joints  $36,000.00

Total[:]                                    $72,000.00

Total with local Tax[:]           $77,940.00

 

Dollar sent the Kirkconnell Estimate
to PCA and Scott Word on January 8, 2001.  In response to the Estimate, PCA
offered to reduce Dollar=s purchase price for the Garage by $50,000.00.  The final
agreed price for Dollar=s purchase of the Garage was $5.5 million.

For reasons unrelated to the Garage=s structural condition, Dollar
notified PCA on January 25, 2001 that it would not proceed with the sale.[2] 
Although PCA was aware the expansion joints would require extensive work at
some point in the future, PCA did not begin the project immediately; however,
Dollar did not consider PCA to be in default on the Lease.  Under the terms of
the Lease, an Aevent of default@ occurs when A[e]ither party shall fail, after ten (10) days= written notice, to comply with any
other term, provision or covenant of this Lease.@[3]  Although the Moore Report provided
PCA with written notice of the structural problems at the expansion joints,
Dollar did not consider PCA to be in default because, according to the Moore
Report, the project could be addressed Awithin one year.@ 








7979 subsequently negotiated with PCA
to purchase the Garage.[4]  The
negotiations were conducted through Word, who acted as the real estate agent
for both PCA and 7979.  Word sent 7979 the Moore Report and the Kirkconnell
Estimate on February 13, 2001.  However, at some point in the five weeks
between receiving the Kirkconnell Estimate from Dollar and conveying it to
7979, Word had added hand-written notations to the Estimate.  Next to Service
1, Word wrote Acould be half.@  Beside Service 2, Word wrote Apd. for by PCA, [Dollar] [illegible]
and supervised.@[5]  Next to Service 3, Word wrote Acosmetic.@  Word also drew a bracket extending
from or connecting Service 2 to Service 4, and beside the bracket he wrote Awas performed by [Dollar=s] vendor.  Supervised by [Dollar]
and paid by [PCA].@  According to Word=s testimony at trial, 7979=s principal, Armand Laskey, asked
Word the meaning of the handwritten notes, and Word responded that the notes
refer to similar repairs that had been performed on the Garage in 1997 or
1998.  According to Word, he made the notes when discussing the Kirkconnell
Estimate with PCA and proposing a $50,000.00 reduction in Dollar=s purchase price of the Garage.  Word
testified that he did not tell 7979 the services listed in the Kirkconnell
Estimate were no longer needed.  He also denied making any representations to
7979 that the work identified in the Moore Report had been performed or still
needed to be performed.  Laskey, however, testified that he construed Word=s notes to mean that the work on the
expansion joints referenced in the Moore Report and the Kirkconnell Estimate
had already been performed.  According to Laskey, Word assured him the work had
been done.

On April 19, 2001, 7979 executed a
written offer to purchase the Garage.  Under the terms of the agreement, 7979
had thirty days to inspect the property.  The purchase agreement was subject to
a rider, stating:

[PCA] acknowledges that [7979] has
advised [PCA] of Structural departs [sic] a[s] set forth in the report prepared
by Walter P. Moore dated December 26, 2000 (the AReport@) . . . . The Property is in
good operating condition and repair, subject only to ordinary wear and tear and
the matters set forth in the Report.  








Word and Laskey subsequently
inspected the Garage.  According to Laskey, there were no problems at the
Garage at that time.  7979 also had the Garage independently appraised.  The
appraisal was based in part on an inspection of the Garage and a review of the
Moore Report.  The appraiser noted that in valuing the Garage, he assumed the
Moore Report was correct, and appraised the property at $7.2 to $8.7 million on
an Aas is@ basis.  The appraiser specifically
described the expansion joints as Adeferred maintenance item[s].@  The appraiser also stated, AThe lease requires Dollar Rent A Car
to reimburse Lessor for all property expenses, except major structural repairs
to the building . . . .@ 

After 7979=s thirty-day inspection period
passed, but before closing the sale, 7979 requested an estoppel certificate
from PCA.  Dollar provided an estoppel certificate to PCA on June 19, 2001, and
PCA immediately forwarded it to 7979.[6]  The
certificate reads in pertinent part:

[T]here are not, to the tenant=s knowledge, (i) any uncured defaults
on the part of the landlord or the tenant under the lease, (ii) any existing
offset[s] or counterclaim[s] against the tenant=s obligation to pay rent under the
lease, or (iii) any defense[s] to the landlord=s enforcement of the tenant=s obligations under the lease.

At trial, Laskey testified that 7979
relied on the estoppel certificate in completing the purchase. 

During the sales negotiations between
PCA and 7979, PCA continued to reimburse Dollar for prior repairs to the
expansion joints.  

On June 20, 2001, PCA and 7979
executed an AAssignment and Assumption of Lease.@  The Assignment contains the
following terms:

[7979] hereby (i) accepts the
Assignment of the Lease; (ii) agrees to be bound by and to perform all of the
terms, covenants and obligations on tenant=s [sic] part to be performed under
the Lease from and after the date hereof; and (iii) agrees to assume all
obligations of  [PCA] thereunder on and after the date hereof.

The witnesses at trial agreed there
were no holes in the Garage on June 20, 2001; however, expansion joint defects
began to necessitate repairs on or about August 13, 2001.   Nonetheless, Dollar
did not inform PCA or 7979 of the increasing urgency of necessary repairs at that
time. 








On August 15, 2001, 7979 purchased
the Garage for $5.35 million, Asubject to [the Moore Report].@  Neither 7979 nor Dollar arranged to
have the work described in the Moore Report performed by December 26, 2001, as
the Moore Report recommended.  

On February 28, 2002, Dollar wrote to
7979 as follows:

The prior owner of this property . .
. was put on notice in December 2000 that there was a structural problem at
this property.  We provided a proposal to repair the [expansion] joints at the
property to the prior owner in January 2001 . . . [W]e are
putting you on notice that we expect the landlord/owner to pay for the repair .
. . .

Dollar attached an updated estimate
from Kirkconnell.  According to Susan Speaker, Dollar=s director of properties and
concessions, she spoke with Laskey, who agreed that 7979 would pay for the
work.  In contrast, Laskey testified that he told Speaker he thought the
repairs had been done, but added that 7979 would do the repairs if it was 7979=s responsibility to do so.     Speaker
wrote to 7979 again on April 3, 2002, asking when 7979 expected to make the
repairs.  7979 did not respond to the letter.  According to Speaker, she spoke
with Laskey on April 10, 2002, and Laskey asked her to obtain the names of
additional potential contractors to perform the work.  On May 2, 2002, Speaker
again wrote to 7979, relaying the names of two more contractors and again
enclosing the updated Kirkconnell Estimate.  7979 did not make the repairs, and
at no time prior to the filing of this suit did 7979 assert that the work was
Dollar=s responsibility or demand that
Dollar pay for the repairs.








Dollar again hired Moore to survey
the expansion joints, and in accordance with Moore=s instructions, Dollar paid a
contractor to install barricades around and safety netting below the damaged
expansion joints to prevent concrete debris from falling from or through the
gaps and striking automobiles, customers, or employees.  Dollar also hired a
law firm to sue 7979 for breach of contract and breach of warranty, and to
obtain a declaratory judgment.       Six months after Dollar filed suit,
contractors hired by 7979 began work on the expansion joints.  The final
project as ultimately bid and performed at 7979=s expense included barricades, signs,
traffic barriers, temporary support of work, and the protection of existing
construction during cutting and patching to prevent damage.  The work was
finished in March of 2003 at a cost of $165,863.41.  7979 paid for the repairs,
but refused to reimburse Dollar for monies Dollar expended on Moore=s May 2002 inspection and the
installation of barricades and safety netting. 

In the meantime, 7979 filed an answer
to Dollar=s suit on July 24, 2002, and amended its answer on September 6, 2002.  In
April 2003, after the work to the expansion joints was completed, the parties
entered a Rule 11 agreement resetting the trial to September or October 2003. 
On August 15, 2003, 7979 amended its answer a third time, added counterclaims
for fraud, breach of contract, and sanctions, alleging that Dollar filed suit
in bad faith.  On October 1, 2003, the trial court ordered the case reset for
trial, and the following day, 7979 amended its answer a fourth time and amended
its counterclaims to allege false representation or failure to disclose
material facts.  After the case was again reset for trial, 7979 amended its
answer a fifth time and its counterclaims a second time.  

In October of 2004, the case was
tried to a jury, and judgment was rendered in favor of Dollar for actual
damages of $16,037.20 plus pre-judgment and post-judgment interest.  In
addition, Dollar was awarded attorneys= fees of $340,000.00, and conditional
attorneys= fees of up to $90,000.00, depending on the number of appeals.[7] 
The trial court denied 7979=s motion for judgment notwithstanding the verdict and its
motion for new trial, and this appeal ensued.

II.  Issues Presented








7979 presents ten compound issues for
our review.  We have grouped these issues substantively by first addressing the
issues that pertain to Dollar=s causes of actions, and then addressing 7979=s affirmative defenses and
counterclaims.  Finally, we discuss 7979=s challenges to the proof of actual
damages and the award of attorneys= fees.  When both legal and factual
sufficiency points are raised, we address the legal sufficiency points first.  See
Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981). 

In its first and ninth issues, 7979
attacks the jury=s findings regarding its breach of contract.  Specifically,
in its first issue, 7979 challenges both the legal and factual sufficiency of
the evidence supporting the jury=s finding that 7979 failed to comply
with the Lease; alternatively, 7979 argues that the Lease and record
conclusively establish that Dollar is responsible for the repair costs at
issue.  Similarly, 7979 argues in its ninth issue that it conclusively established
that 7979 paid for repairs that were Dollar=s responsibility.  Alternatively,
7979 contends that the jury ignored the great weight and preponderance of the
evidence in failing to find that 7979 paid for repairs that were Dollar=s contractual responsibility.  

In its third and fourth issues, 7979
attacks the jury=s finding that 7979 breached the implied  warranty of suitability. 
7979 asserts in its third issue that the evidence is legally and factually
insufficient to support this finding, and in its fourth issue, 7979 argues that
only PCA can be liable to Dollar for such a breach.

In issues five, six, and seven, 7979
challenges the jury=s failure to find that Dollar was estopped from asserting
that 7979 breached the Lease or the implied warranty of suitability, or that
such breaches were otherwise excused.  7979 phrases this in its fifth issue as
a challenge to the legal and factual sufficiency of the evidence supporting the
jury=s findings that these breaches were
not excused, and in its seventh issue, 7979 contends that the Estoppel
Certificate defeats Dollar=s claims.  In its sixth issue, 7979 similarly contends that
Dollar is legally or equitably estopped from asserting its breach of contract
action.  








7979 argues in its second issue that
the trial court improperly denied 7979=s post-verdict motions asking the
trial court to disregard the jury=s answers to ten specific questions.
These issues primarily pertain to 7979=s counterclaim for breach of
contract.  In its eighth issue, 7979 asserts that the evidence is legally and
factually insufficient to support the jury=s finding that Dollar incurred
$16,037.20 to make repairs that were 7979=s contractual responsibility. 
Finally, in its tenth issue, 7979 attacks the award of attorneys= fees on the grounds that they are
unsegregated and excessive. 

III. 
Standard of Review

The test for legal sufficiency is
whether the evidence at trial Awould enable reasonable and fair-minded people to reach the
verdict under review.@  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005).  In making this determination, we must view the evidence in the light
most favorable to the verdict, crediting any favorable evidence if a reasonable
fact-finder could and disregarding any contrary evidence unless a reasonable
fact-finder could not.  Id. at 827.  We assume jurors made all
inferences in favor of their verdict if reasonable minds could, and disregard
all other inferences.  Id. at 821.  We cannot substitute our judgment
for that of the jury, so long as the evidence falls within the zone of
reasonable disagreement.  See id. at 822.  We will sustain a legal
sufficiency challenge only when (1) the record discloses the complete
absence of a vital fact, (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact,
(3) the only evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence conclusively establishes the opposite of a
vital fact.  Id. at 810.  We apply this standard both to a direct
challenge to the jury=s verdict and to the trial court=s denial of a motion notwithstanding
the verdict.  See id. at 823; Tiller v. McLure, 121 S.W.3d 709,
713 (Tex. 2003) (per curiam) (AA trial court may grant a judgment notwithstanding the
verdict if there is no evidence to support one or more of the jury findings on
issues necessary to liability.@).








When considering a factual
sufficiency challenge to a jury=s verdict, we must review and weigh all the evidence, not
just the evidence that supports the verdict.  See Mar. Overseas Corp. v.
Ellis, 971 S.W.2d 402, 406B07 (Tex. 1998); Nip v. Checkpoint Sys., Inc., 154
S.W.3d 767, 768B69 (Tex. App.CHouston [14th Dist.] 2004, no pet.).  We may set aside the
verdict only if it is so contrary to the overwhelming weight of the evidence
that the verdict is clearly wrong and unjust.  See Mar. Overseas Corp.,
971 S.W.2d at 407; Nip, 154 S.W.3d at 769.

IV.  Analysis

 A.       7979=s Breach of the Lease

7979 argues on appeal that the
evidence is both legally and factually insufficient to support the jury=s finding that 7979 failed to comply
with the Lease.  According to 7979, paragraph 17 of the Lease unambiguously
requires 7979 to make repairs only to the foundation, exterior walls, and roof,
and requires Dollar to make all other repairs or replacements.  Under the
appropriate standard of review, 7979=s claims are meritorious only if the
Lease (a) is ambiguous, and extrinsic evidence is insufficient to support the
jury=s conclusion that the parties to the
Lease intended the landlord to bear these costs, or (b) is unambiguous and
requires Dollar to bear the costs of repairing the expansion joints.








Our primary concern in interpreting a
contract is ascertaining the true intent of the parties as expressed in the
instrument.  J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003);  Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex.
1996); Hewlett-Packard Co. v. Benchmark Elecs., Inc., 142 S.W.3d 554,
561 (Tex. App.CHouston [14th Dist.] 2004, pet. denied).  We examine the writing as a
whole in an effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless. Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983); Hewlett-Packard, 142 S.W.3d at 561.  We
presume that the parties to a contract intend every clause to have some
effect.  Heritage Res., 939 S.W.2d at 121.  We give terms their plain,
ordinary, and generally accepted meaning unless the contract shows the parties
used them in a technical or different sense.  Id.  ANo single provision taken alone will
be given controlling effect; rather, all the provisions must be considered with
reference to the whole instrument.@  J.M. Davidson, Inc., 128
S.W.3d at 229.  We construe a contract by determining how the Areasonable person@ would have used and understood its
language, considering the circumstances surrounding the contract=s negotiation and keeping in mind the
purposes intended to be accomplished by the parties when entering into the contract. 
Nat=l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N.
Am., 955 S.W.2d 120,
127B28 (Tex. App.CHouston [14th Dist.] 1997), aff=d sub nom, Keck, Mahin & Cate v. Nat=l Union Fire Ins. Co. of Pittsburgh,
PA, 20 S.W.3d 692,
704 (Tex. 2000). 

Here, the purpose the parties
intended to accomplish is set forth in the Lease itself: the landlord is
required to construct, and the tenant is required to operate, a three-story Afirst-class parking facility.@  Specifically, the landlord is
required to construct a three-story parking garage of approximately 293,000
square feet, insure the building against loss or damage for its full
replacement value, and lease it to the tenant for fifteen years.  The tenant is
permitted to use 2,200 square feet to operate a car rental business, and must Aoperate the remainder of the Garage
as a first-class parking facility . . . .@  The tenant is required to Amaintain the highest standards in the
operation of the Garage so that the Parking Facility shall be operated in a
fashion comparable to other first-class parking facilities in similar type
buildings in the Houston area.@  The tenant is also required to Aprovide all materials, supplies and
equipment needed for the proper and efficient use and operation of the Garage@ and Ause its best efforts to maintain and
develop the Garage and to increase the volume of business for the same, and not
to divert or cause to be diverted any business from the Garage to other parking
facilities . . . .@  

As part of its obligation to operate
a first-class parking facility, the tenant is required to provide, maintain and
operate at least four shuttle vehicles to carry parking customers between the
Garage and Hobby Airport Terminal, and to Aoperate such vehicles at all times
necessary to provide prompt service.@  The tenant is required to pay the
landlord the first $28,000.00 of net parking revenue, and any amounts due for
guaranties, marketing expenses, taxes, or insurance.  The tenant is then
required to pay the landlord forty percent of the next $22,0000.00 of net
parking revenue, and fifty percent of any remaining net parking revenue.








Reading the Lease as a whole, we
disagree with 7979=s contention that paragraphs 17a and 17b of the Lease
unambiguously restrict the landlord=s repair obligations to the
foundation, exterior walls, and roof, and require Dollar to bear the cost of
any other repair or replacement, regardless of its nature.  7979=s interpretation would permit the
lessor to construct the outer shell of the building and leave the second and
third floors in an incomplete or defective state, thereby transferring the cost
of properly completing construction to the tenant.  Thus, this interpretation
would contradict the allocation of responsibilities expressly provided for in
the Lease.  

7979=s interpretation is also inconsistent
with the parties= allocation of the risk of loss as shown in the Lease=s insurance requirements.  The tenant
is required to insure its own property, the property of its customers, and its
public liability, but is not required to insure any part of the Garage.  The
landlord is required to maintain insurance Afor the full replacement value of the
Garage@ in the event of its loss or damageCeven though, under 7979=s interpretation of the Lease, the
tenant is required to repair or replace essentially the entire interior of the
building. 

Finally, 7979=s interpretation effectively exempts
the second and third floors of the Garage from the implied warranty of
suitability without express language to that effect.[8] 
This interpretation is contrary to Texas law, which provides that a tenant
waives latent defects only if he takes the premises Aas is@ or expressly assumes the obligation
to repair.[9] 








We disagree that a reasonable person
would interpret the language of the Lease in the manner urged by 7979.  On the
contrary, the only reasonable interpretation of the relevant language is that
the landlord must make structural repairs to the Garage, and must repair the
foundation, exterior walls, and roof, even if the damage to these areas is not
physical or structural (for example, if the damage is merely cosmetic).[10] 
Because the interpretation urged by 7979 is unreasonable and inconsistent with
the overall allocation of risks and responsibilities demonstrated throughout
the remainder of the Lease, we conclude the Lease unambiguously allocates the
costs of the repairs at issue to the landlord.  See Universal Health Servs.
v. Renaissance Women=s Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003)
(explaining that a contract is ambiguous if it is subject to two or more Areasonable@ interpretations after applying the
pertinent rules of construction).[11]

7979=s first issue, challenging the legal
and factual sufficiency of the evidence supporting the jury=s finding that 7979 failed to comply
with the Lease, is overruled.  For the same reasons, we hold 7979 did not
conclusively establish that Dollar is responsible for the costs of repairs, and
overrule 7979=s ninth issue.








B.        7979=s Breach of the Implied Warranty of
Suitability

7979=s third issue challenges the legal
and factual sufficiency of the evidence supporting the jury=s finding that 7979 breached the
implied warranty of suitability.  In its fourth issue, 7979 makes the related
argument that any breach of the implied warranty occurred prior to 7979=s ownership of the property.  In
support of this argument, 7979 relies on paragraph 42 of the Lease, which
states: ALessee shall look solely to the then
owner of the Leased Premises at the time of the breach or default for the
satisfaction of any remedies of Lessee.@ 

1.         Elements
of the Implied Warranty of Suitability








The implied warranty of suitability Ameans that at the inception of the
lease there are no latent defects in the facilities that are vital to the use
of the premises for their intended commercial purpose and that these essential
facilities will remain in a suitable condition.@  Davidow v. Inwood N. Prof=l GroupCPhase I, 747 S.W.2d 373, 377 (Tex. 1988).  A
landlord may be liable for breach of this warranty if the evidence shows that:
(1) the landlord leased property to the tenant, (2) the lease covered
commercial property, (3) the leased property had a latent physical or
structural defect[12] at the
inception of the lease,[13] (4) the
defect was in an area that was vital to the property for its intended
commercial purpose,[14] (5) the
defect made the property unsuitable for its intended commercial purpose, and
(6) the tenant suffered injury.  Factors the trier of fact may consider in
determining whether there has been a breach of the implied warranty of
suitability include[15] the nature
of the defect;[16] its effect
on the tenant=s use of the premises;[17] the length
of time the defect persisted;[18] the age of
the structure; the amount of the rent; the area in which the premises are
located; whether the tenant waived the defects; and whether the defect resulted
from any unusual or abnormal use by the tenant.

2.         Evidence
Relevant to the Breach of the Implied Warranty of Suitability

A latent defect is one not
discoverable by a reasonably prudent inspection of the premises at the
inception of the lease.[19]  By its
terms, the Lease became effective when the Garage was Asubstantially complete@; therefore, the problem with the
expansion joints was a latent defect only if the joints were defective, and the
defect was undiscoverable by a reasonably prudent inspection when the Garage
was substantially complete.  








Here, the expansion joints
essentially connect the two halves of the building, and problems with the
expansion joints have been repeatedly characterized as Astructural@ by the engineering experts and the
parties.  A 1998 engineering report suggests that the expansion joints were
inadequate to properly support the shuttle buses that Dollar is required to
operate.  There is no evidence that the defect was discovered before 1998, and
no evidence that problems with the expansion joints rendered any part of the
Garage unsuitable for its intended operations until after 7979 assumed the
Lease.  According to the evidence presented at trial, problems caused by the
expansion joints temporarily caused the closure of nearly half of the parking
spots in the Garage.[20]  Shuttles
could not traverse parts of the Garage, and Dollar=s customers were directed away from
certain areas to avoid the defect.  Thus, on the record before us, we conclude
that a reasonable jury could find that (a) the expansion joints were defective
at the Lease=s inception, (b) the defect made parts of the Garage unsuitable for the
operation of shuttles as intended, (c) the defect could not have been
discovered until after the Garage was substantially complete and Dollar began
to operate the shuttles, and (d) Dollar was injured by 7979=s failure to maintain the property. 

In a related argument, 7979 contends
that Dollar is responsible for the repair costs because the damage was caused
by Dollar=s own operations.  In support of this argument, 7979 relies on a 1998
report by an engineer who inspected the expansion joints and provided temporary
repairs.  In this report, the engineer stated, AAs heavier vehicles drive across the
gaps, a vibration is set up . . . . The vibration from the impact has in some
areas, loosened the concrete floor topping.@  According to 7979, Dollar caused
the damage by operating shuttles and is therefore required to pay for the
repairs.  But the Lease requires Dollar to operate at least four shuttle
vehicles Aat all times necessary to provide prompt service.@  These operations are part of the
intended purpose of the Garage, and the implied warranty of suitability
requires the landlord to construct and maintain the Garage in a manner suitable
for these operations.  

We overrule issues three and four. 

C.        Estoppel








7979 argues that Dollar is estopped
from asserting claims against it because Dollar=s estoppel certificate recites that
the prior owner is not in default, and Dollar did not attach the Moore Report
to the estoppel certificate.  To prevail on its affirmative defense that Dollar
is equitably estopped from asserting its claims, 7979 was required to produce
evidence of the following: (1) a false representation or concealment of
material facts, (2) made with actual or constructive knowledge of those facts,
(3) with the intention that the representation should be acted on, (4) the
representation was made to a party who was without knowledge or means of
obtaining knowledge of the real facts, and (5) the party to whom the
representation was made detrimentally relied on the representations.  See
Johnson & Higgins v. Kenneco Energy, 962 S.W.2d 507, 515B16 (Tex. 1998). 

Here, at a minimum, elements 1, 2, 4,
and 5 are unsupported by evidence.  At the time Dollar signed the estoppel
certificate on June 19, 2001, the landlord had not failed to make repairs that
were requested and required either by the condition of the premises or the
Moore Report.  Accordingly, Dollar=s statement that there were no Auncured defaults@ on June 19, 2001 did not constitute
a false representation or a concealment of material fact made with actual or
constructive knowledge of the true conditions.[21]


In addition, 7979 was not Aa party without knowledge or means of
obtaining knowledge of the real facts.@  To the contrary, 7979 was aware
that the expansion joints needed to be repaired by December 26, 2001 because
7979 had been given a copy of the Moore Report more than four months before the
estoppel certificate was signed.  7979 also had the Garage independently
appraised before the purchase, and the appraiser incorporated and relied on the
Moore Report.  Finally, 7979 did not rely on the estoppel certificate to show
that there was no need for structural repairs, but entered into the purchase
agreement expressly subject to the Moore Report. 

In its sixth and seventh issues, 7979
argues that Dollar is estopped from asserting its claims of breach of contract
and breach of the implied warranty of suitability due to misrepresentations or
omissions from the estoppel certificate.  7979 rephrases the same question in
its fifth issue, challenging the jury=s finding that 7979=s breaches of contract and warranty
were not excused.  Because there is no evidence supporting several essential
elements of estoppel, we overrule issues five through seven.








D.        Dollar=s Breach of the Lease

7979 also contends that the jury
found that Dollar failed to comply with the Lease, but awarded no damages for
the breach.  Essentially, 7979 argues that the two jury findings are
inconsistent and conflicting.

When determining whether jury
findings conflict, the threshold question is whether the findings address the
same material fact.  Bender v. S. Pac. Transp. Co., 600 S.W.2d 257, 260
(Tex. 1980).  We may not strike jury answers on the ground of conflict if there
is any reasonable basis upon which they can be reconciled in light of the
pleadings and evidence, the manner of submission, and the other findings
considered as a whole.  Ford Motor Co. v. Miles, 141 S.W.3d 309, 314B15 (Tex. App.CDallas 2004, pet. denied).  

7979 argues that Dollar breached the
Lease by failing to provide 7979 with immediate notice of the need for
repairs.  Testimony at trial showed there were no holes in the Garage before
July 20, 2001, the date on which 7979 assumed the Lease.  Repairs were actually
required on or about August 13, 2001, and Dollar demanded repairs on February
28, 2002, approximately two months after the date suggested in the Moore Report
as the deadline for completion of the repairs.  Hence, the jury=s finding that Dollar failed to
comply with the Lease is supported by evidence that Dollar failed to give
immediate notice to 7979 of the need for repairs.  








Despite Dollar=s failure to give immediate notice of
the need for repairs directly to 7979, the evidence shows 7979 had actual
notice of the need for repairs from PCA and from Scott Word before the problems
with the expansion joints began to interfere with Dollar=s operations.  PCA and Word forwarded
7979 copies of the Moore Report and the Kirkconnell Estimate months before 7979
purchased the Garage, and the purchase was made expressly subject to the items
in the Moore Report.[22]  The jury
could therefore conclude that 7979 was not damaged by Dollar=s failure to give 7979 immediate
notice of the need for repairs because 7979 had received notice from another
source.

Moreover, we conclude that the jury=s failure to award 7979 damages is
not inconsistent with its finding that Dollar failed to comply with the Lease
for an additional reason.  In the damage question at issue, the jury was asked:
AWhat sum of money, if any, if paid
now in cash, would fairly and reasonably compensate 7979 for its damages, if
any, that resulted from Dollar=s failure to comply?@  The accompanying instructions
defined the sum to be determined as A[r]easonable and necessary costs
incurred by 7979 to make repairs to the Parking Garage that were the
obligation of Dollar under the Lease Agreement.@ (emphasis added).  Notably, the jury
was not asked to determine what payment would compensate 7979 for Dollar=s delay in providing 7979 with notice
of the need for repairs.  The record reflects 7979 submitted no evidence it was
harmed by Dollar=s failure to provide additional notice prior to February 28,
2002.[23] 

We overrule 7979=s second issue, which essentially
challenges the jury=s verdict as inconsistent.[24]

E.        Proof
of Actual Damages








Although the jury awarded Dollar
$16,037.20 as Areasonable and necessary costs incurred by Dollar to make repairs to the
Parking Garage that were the obligation of 7979 under the Lease,@ 7979 argues that these costs were
not for Arepairs,@ but for barricades and safety
netting erected to prevent personal and property damage from the existing holes
and falling concrete.[25]  7979 argues
that because these costs did not Arepair@ the expansion joint, Dollar was not
entitled to be reimbursed for them.[26]          

This argument misreads the jury
charge.  The jury was asked to determine Dollar=s costs Ato make repairs,@ and not merely the costs for the
repairs themselves.  Moreover, the evidence includes engineering reports
listing barricades and temporary supports such as safety netting among the
measures necessary to make repairs.  Accordingly, the jury=s finding that Dollar incurred
$16,037.20 Ato make repairs@ to the Garage is supported by the record, and is not
contrary to the overwhelming weight of the evidence.

We overrule 7979=s eighth issue.

F.        Attorneys= Fees

7979=s tenth issue challenges the award of
Dollar=s attorneys= fees on the grounds that the fees
are not segregated and are excessive.  In supplemental briefing in support of
its motion for rehearing, 7979 argues that the Texas Supreme Court=s opinion in Tony Gullo Motors I,
L.P. v. Chapa requires that we remand this matter for a redetermination of
Dollar=s recoverable attorneys= fees.  See Tony Gullo Motors I,
L.P. v. Chapa, 212 S.W.3d 299 (Tex. 2006).  

1.         Segregation of Attorneys= Fees








Because a party seeking attorneys= fees must show that the fees were
incurred in connection with a claim that allows their recovery, parties are
ordinarily required to segregate fees incurred for such work from fees incurred
in connection with claims for which no such recovery is allowed.  See id.
at 313B14 (eliminating the exception to the
segregation requirement for fees incurred solely on a separate but intertwined
claim).  If any attorneys= fees relate solely to a claim for which such fees are
unrecoverable, the claimant must segregate recoverable from unrecoverable
fees.  Id. at 313.   But this standard does not require attorneys to Akeep separate time records when they
draft[] the fraud, contract, or DTPA paragraphs of [a] petition@; rather, the evidence of the amount
of recoverable attorneys= fees is sufficiently segregated, if for example, the
attorney testifies that a given percentage of the drafting time would have been
necessary even if the claim for which attorneys= fees are nonrecoverable had not been
asserted.  Id. at 314.  

Here, 7979 argues that Dollar was
required to segregate attorneys= fees incurred in prosecuting its breach of contract claim
from fees incurred (a) defending against 7979=s counterclaims, and (b) prosecuting
its claim for breach of the implied warranty of suitability.  On this record,
we disagree with 7979=s first contention, but we agree that Dollar is not entitled
to recover attorneys= fees incurred solely in connection with its claim for breach
of the implied warranty of suitability.

a.       Fees Dollar Incurred in Defeating Counterclaims 








7979 contends that
attorneys= fees incurred in defending against claims of fraud
and breach of contract are not recoverable; thus, it argues, Dollar was
required to segregate the attorneys= fees it incurred
in prosecuting its claims from the fees incurred in defending against 7979=s  fraud and
breach of contract counterclaims.  This argument fails to give due
consideration to the procedural posture of this case.  By asserting these
causes of action as counterclaims, 7979 not only sought to recover damages, but
also to reduce or avoid liability for Dollar=s contract claim. 
As the Texas Supreme Court stated in Tony Gullo Motors, Ato prevail on a
contract claim a party must overcome any and all affirmative defenses (such as
limitations, res judicata, or prior material breach), and the opposing party who raises
them should not be allowed to suggest to the jury that overcoming those
defenses was unnecessary.@  Id. at 314.  By the same token, when a defendant
asserts a counterclaim that the plaintiff must overcome in order to fully
recover on its contract claim, the attorneys= fees necessary to defeat that
counterclaim are likewise recoverable.  See Varner v. Cardenas, 50 Tex.
Sup. Ct. J. 525, 2007 WL 624074, at *1 (Tex. March 2, 2007) (per curiam). 
Thus, Dollar does not have to segregate these fees from the fees necessary to
prosecute Dollar=s breach of contract claim.








            Here, the claims and
counterclaims depend upon many of the same essential facts, using the same
documents and witnesses, and Dollar had to defeat 7979=s claims Abefore it could recover.@  See Tony Gullo Motors, 212
S.W.3d at 314; Varner, 2007 WL 624074, at *1; RepublicBank Dallas,
N.A. v. Shook, 653 S.W.2d 278, 282 (Tex. 1983).  Dollar and 7979 each
asserted that the other breached the Lease by failing to pay for repairs to the
expansion joints.  Evidence and argument concerning the Lease, the need for
repairs, the date on which each of the parties became aware of the need for
repairs, and the date and cost of repairs are relevant both to Dollar=s claims and 7979=s counterclaims.  7979 asserted a
counterclaim for fraud by nondisclosure,[27]
alleging that Dollar committed this tort by failing to inform 7979 that the
prior landlord was in default and by failing to attach the Moore Report to the
estoppel certificate. 7979 additionally counterclaimed for fraud,[28]
alleging that Dollar falsely represented there was no uncured default by the
prior landlord.  Dollar=s defense to the counterclaims involves much of the same
evidence and testimony relevant to Dollar=s breach of contract claim.  Evidence
that (a) repairs became necessary, (b) 7979 was notified of the need for
repairs,[29] (c) repairs
are the landlord=s responsibility, (d) 7979 failed to timely make required
repairs, and (e) the default arose after 7979=s assumption of the Lease, were
essential both to Dollar=s claims and to its defense against 7979=s counterclaims.  








With the exception of its experts on
attorneys= fees and damages, all of Dollar=s witnesses testified to one or more
of these common facts.  Susan Speaker of Dollar testified that problems from
the expansion joints arose in November or December of 2001 and February of
2002; that Dollar notified 7979 of its default on June 25, 2002; and that the
prior landlord was never in default.  Eric Chaves of PCA testified that PCA
received no default notices; that PCA was not in default prior to the sale; and
that Dollar never lost the use of parking spaces during PCA=s ownership.  Scott Word, who acted
as the real estate broker for both PCA and 7979 in this transaction, testified
that he attended the site inspection with 7979=s principal, and there was no falling
cement and no parking spaces blocked off at that time.  Jesse Alba, city
manager for Dollar from July 20, 2001 to October 21, 2001, testified that there
were no holes in the Garage or blocked parking spaces when he began managing
the facility; that on October 21, 2001, there was one hole and about twenty
spaces were blocked; that he obtained repair estimates on August 28 and 31,
2001; that Dollar=s customers began to complain; and that Dollar subsequently
had to reroute shuttles and could not use some areas of the Garage.  Faisal
Mustafa, city manager for Dollar from November 2001 to June 2004, authenticated
photographs he had taken in May 2002 of holes in the driveway and in the second
and third floors.  He further testified regarding parking spaces that were
blocked off, stating that the number of spaces affected increased in 2002.  He
also testified that Dollar was advised not to take shuttles on the second and
third floors at all; that barricades had to be erected; that Dollar had to drop
its parking rates; and that Dollar lost several monthly contract customers.  

The documentary evidence necessary
for Dollar=s breach of contract claim also overlapped with the evidence necessary
for the remaining claims and counterclaims.  Interpretation of the Lease was
required to determine whether and when a default arose, and that determination was
essential to the contract, warranty, and fraud claims.  Evidence of prior
temporary repairs, paid for by PCA, provided extrinsic evidence of the landlord=s contractual obligation, and was
also relevant to Dollar=s warranty claim.[30]  The Moore
Report was evidence of the need for repairs, and documents and testimony
tracing the Moore Report=s transmission from Dollar to PCA and Word and finally to
7979 and its appraiser are relevant to every claim and counterclaim in the
case.

If believed, the evidence Dollar
presented in prosecuting its breach of contract claim was also dispositive of
its claim for breach of the implied warranty of suitability and 7979=s counterclaims.  Dollar=s lead attorney testified that the
prosecution of Dollar=s claims was Aso intertwined@ with the defense of 7979=s counterclaims that Ayou can=t possibly split out what the
services were for.@  

On the record before us, we conclude
Dollar was not required to segregate the  attorneys= fees it incurred to prosecute its
breach of contract claim from the fees incurred to defeat 7979=s counterclaims. 

b.         Fees
Dollar Incurred Solely to Prosecute Its Warranty Claim








Even if the evidence presented
pertains to all of the claims and counterclaims in the case, a litigant is not
necessarily entitled to recover all of its legal fees.  As the Texas Supreme
Court has recently made clear, the determination focuses on whether the legal
work performed pertains solely to claims for which attorneys= fees are not recoverable.  Moreover,
in making this determination, factfinders do not examine the work product as a
whole, but parse the work into component tasks.  See Tony Gullo, 212
S.W.3d at 313 (ABut when Chapa=s attorneys were drafting her
pleadings or the jury charge relating to fraud, there is no question
[that] those fees were not recoverable.@) (emphasis added); id. at 314
(AChapa=s attorneys did not have to keep
separate time records when they drafted the fraud, contract, or DTPA paragraphs
of her petition; an opinion would have sufficed stating that, for example,
95 percent of their drafting time would have been necessary even if there had
been no fraud claim.@) (emphasis added).  If any of the component tasks relate
solely to a cause of action for which legal fees are not recoverable, the
claimant must segregate the fees.    








That standard has not been satisfied
in this case.  For example, Dollar=s petition contains a paragraph
asserting its cause of action for breach of the implied warranty of
suitability, and the jury charge contains two jury questions that pertain
solely to this claim.[31] The
attorneys= fees relating solely to the prosecution of those claims and hence, to
drafting this language, are not recoverable.  Although the jury charge and the
petition contain less than a dozen sentences related solely to this claim, Aunrecoverable fees [are not] rendered
recoverable merely because they are nominal . . . .@  Tony Gullo Motors, 212
S.W.3d at 313. 

The Court=s conclusion in Tony Gullo Motors
therefore applies to the present case: A[W]hen, as here, it cannot be denied
that at least some of the attorney=s fees are attributable only to
claims for which fees are not recoverable, segregation of fees ought to be
required and the jury ought to decide the rest.@  Id. at 314.  But Dollar did
not forfeit its right to recover attorneys= fees by failing to segregate them.  See
id.  The evidence it presented regarding the total amount of attorneys= fees it incurred is some evidence of
what the segregated amount should be.  See id.  We therefore sustain
7979=s tenth issue in part, reverse that
portion of the judgment awarding attorneys= fees to Dollar, sever that portion
of the judgment, and remand this issue for a new trial on attorneys= fees.  

As a result of our disposition of
this issue, we do not reach the question of whether the total attorneys= fee award is excessive.








V.  Conclusion

We reverse that portion of the
judgment awarding attorneys= fees to Dollar, sever that portion of the judgment, and
remand the issue to the trial court for a determination of  Dollar=s recoverable attorneys= fees in a manner consistent with
this opinion.  In all other respects, we affirm the judgment of the trial
court.

 

 

/s/        Eva M. Guzman

Justice

 

 

Judgment
rendered and Opinion on Rehearing filed April 27, 2007.

Panel
consists of Chief Justice Hedges and Justices Yates and Guzman.

 









[1]  Dollar is the successor by merger to the original
tenant under the lease.





[2]  Dollar=s
agreement to purchase the Garage was conditioned on the approval of Dollar=s board of directors, and the board failed to approve
the purchase.





[3]  The Lease defines eight other events of default, but
these are not relevant to the case.





[4]  Empire State Collateral negotiated the purchase, and
formed 7979 days prior to closing.  For the sake of clarity, we refer to both
entities as 7979.





[5]  Word was asked to decipher this note at trial and
was unable to do so. 





[6]  Under the terms of the Lease, Dollar was required to
provide PCA with an estoppel certificate upon request.  PCA therefore requested
an estoppel certificate from Dollar.  





[7]  The jury found that Dollar incurred reasonable fees
for necessary services Ain this case@ in
the amount of $340,000 for preparation and trial, $40,000 for an appeal to the
Court of Appeals, $10,000 if a petition for review was filed in the Texas
Supreme Court, and $40,000 if such a petition for review was granted.  7979
sought $200,000.00 for its attorneys=
fees through trial, $48,000.00 for legal fees in the event of an appeal to the
Court of Appeals, $20,000.00 in the event of a motion for rehearing or petition
for review was filed, and $40,000.00 if the Texas Supreme Court granted review.






[8]  When an agreement is silent or obscure as to a
particular subject, the law and usage become a portion of it and constitute a
supplement to it and interpret it.  Luling Oil & Gas Co. v. Humble Oil
& Ref. Co., 144 Tex. 475, 191 S.W.2d 716, 724 (1946); Panama-Williams,
Inc. v. Lipsey, 576 S.W.2d 426, 431 (Tex. Civ. App.CHouston [1st Dist.] 1978, writ ref=d n.r.e.).  Part of the law in effect at the inception
of the Lease was the law governing the implied warranty of suitability.  AThis warranty means that at the inception of the lease
there are no latent defects in the facilities that are vital to the use of the
premises for their intended commercial purpose and that these essential
facilities will remain in a suitable condition.@  Davidow v. Inwood N. Prof=l GroupCPhase I, 747 S.W.2d 373, 377
(Tex. 1988).  This is so because Acommercial
tenants generally rely on their landlords=
greater abilities to inspect and repair the premises.@ Id. at 376.





[9]  Gym-N-I Playgrounds, Inc. v. Snider, C S.W.3d C ,
2007 WL 1164117, at *4 (Tex. April 20, 2007) (enforcing an express waiver of
the warranty of suitability in a lease in which the tenant took the property Aas is@); Davidow,
747 S.W.3d at 377 (stating that if Athe
parties to a lease expressly agree that the tenant will repair certain defects,
then the provisions of the lease will control.@). 





[10]  In its motions for rehearing, 7979 argues that such
a result is inconsistent with this court=s
opinion in Chen v. RB & RB Invs., Inc., No. 14-02-00178-CV, 2003 WL
297674, at *1 (Tex. App.CHouston [14th Dist.] 2003, no pet.) (mem. op.)
(imposing the duty to repair electrical wiring on the lessee when both the
landlord and the lessee were aware of the problems with the wiring, and the
lessee took the premises Aas is@). Although the
facts in Chen are readily distinguished from those presented here, our
reasoning in both cases is consistent.  In Chen, we stated that, A[b]y mentioning only structural components of
the premises in describing the landlord=s
duties, we cannot construe the lease as Chen suggests to include the wiring as
well.@ (emphasis added).  Here, the lease similarly mentions
only structural components in describing the landlord=s duties, but unlike the electrical problems in Chen,
the defect in this case is also a structural component.  See also Schulze v.
C. & H. Builders, Inc., 761 S.W.2d 219 (Mo. Ct. App. 1988) (holding
that cracks in a garage floor were a latent structural defect); Trapalis v.
Gershun, 145 N.W.2d 591 (Iowa 1966) (holding that, if the lease required
the landlord to maintain the exterior of the roof, structural walls, and
sidewalks in good repair, then the landlord was liable to tenant for
demolishing an unsafe building instead of strengthening the foundation, foundation
walls, and bearings for the floor joists).  





[11]  Because the Lease is unambiguous, the trial court
erred in submitting a jury question asking if 7979 failed to comply with the
Lease; however, the jury answered the question in the affirmative, and thus,
the error is harmless.





[12]  Coleman v. Rotana, Inc., 778 S.W.2d 867, 871
(Tex. App.CDallas 1989, writ denied).





[13]  Davidow, 747 S.W.2d at 377. 





[14]  Id. at 374B75.





[15]  Id. at 377.





[16]  Parts Indus.Corp. v. A.V.A. Servs., Inc., 104
S.W.3d 671, 680 (Tex. App.CCorpus Christi
2003, no pet.) (leaky roof in warehouse); Neuro-Developmental Assocs. of
Houston v. Corporate Pines Realty Corp., 908 S.W.2d 26, 27 (Tex. App.CHouston [1st Dist.] 1995, writ denied) (malfunctioning
heating and air conditioning in clinic treating physical and speech handicaps
of infants and children); Ruiz v. Hilley, No. 14-94-00635-CV, 1996 WL
580940, *2B3 (Tex. App.CHouston
[14th Dist.] 1996, no writ) (not designated for publication) (problems with air
conditioning, one toilet, leaking roof, and lack of insulation in church) .





[17]  Davidow, 747 S.W.2d at 375 (APatients were directed away from certain areas during
rain so that they would not be dripped upon in the waiting room.@). 





[18]  Id. at 374B75.






[19]  See Gupta v. Ritter Homes, Inc., 646 S.W.2d
168, 169 (Tex. 1983).  





[20]  At its worst, immediately before the repairs were
performed, the damage rendered 298 of the Garage=s 618 spaces unusable. 





[21]  We also note that Dollar did not make the Arepresentation@ at
issue to 7979, but to PCA.  





[22]  Although Laskey testified that Word assured him the
repairs had been performed, Laskey=s
testimony was contradicted by Word.  Moreover, Word is not Dollar=s agent, but 7979=s
agent; therefore, his statements are not attributable to Dollar.





[23]  After receiving actual notice of the need for
repairs directly from Dollar, 7979 waited an additional thirteen months to
complete the repairs.





[24]  7979 argues in the alternative that the jury found
Dollar failed to comply with the Lease because Dollar failed to perform the
repairs.  Because the jury=s findings can
be reconciled on the reasonable basis discussed above, we do not reach this
argument.





[25]  7979 contends that the jury arrived at this figure
by adding the cost of the engineer=s
report delineating the work needed to the cost of safety netting and barricades
erected around the damaged joints.  7979 does not contend that the engineer=s report was not a repair cost.





[26]  In its counterclaim, 7979 asked the jury to
reimburse 7979 for the costs of similar safety measures taken in the course of
repair.  In asking this court to reverse and render judgment, 7979 continues to
argue that its own repair costs are conclusively shown on the record, and
includes its costs for barricades, signs, traffic barriers, temporary support
of work, and the protection of existing construction.  Thus, both at trial and
on appeal, 7979 has argued that costs incurred to secure the area under repair
and protect the surrounding area are not Arepair
costs,@ but applies this argument only to expenses paid by
Dollar.  7979 makes no attempt to reconcile these two apparently contradictory
positions. 





[27]  Elements of fraud by nondisclosure are: (1) the
defendant failed to disclose facts to the plaintiff; (2) the defendant had a
duty to disclose those facts; (3) the facts were material; (4) the defendant
knew the plaintiff was ignorant of the facts and the plaintiff did not have an
equal opportunity to discover the facts; (5) the defendant was deliberately
silent when it had a duty to speak; (6) by failing to disclose the facts, the
defendant intended to induce the plaintiff to take some action or refrain from
acting; (7) the plaintiff relied on the defendant=s nondisclosure; and (8) the plaintiff was injured as a result of
acting without that knowledge. See Bradford v. Vento, 48 S.W.3d 749, 754B55 (Tex. 2001); Schlumberger Tech. Corp. v. Swanson,
959 S.W.2d 171, 181 (Tex. 1997); Bright v. Addison, 171 S.W.3d 588, 599
(Tex. App.CDallas  2005, pet. dism=d).





[28]  The elements of fraud are: (1) the defendant made a
representation to the plaintiff; (2) the representation was material;
(3) the representation was false; (4) when the defendant made the
representation, the defendant knew the representation was false, or made the
representation recklessly, without knowledge of its truth; (5) the
defendant made the representation with the intent that the plaintiff act on it;
(6) the plaintiff relied on the representation; and (7) the
representation caused the plaintiff injury.  In re FirstMerit Bank, 52
S.W.3d 749, 758 (Tex. 2001) (orig. proceeding).





[29]  The Lease provides that A[i]n the event that the Leased Premises should become
in need of repairs required to be made by Lessor hereunder, Lessee shall give
immediate written notice thereof to Lessor and Lessor shall not be responsible
in any way for failure to make any such repairs until a reasonable time shall
have elapsed after delivery of such written notice.@





[30]  This evidence would allow Dollar to recover its
proven damages if the trial court found the Lease unambiguously requires 7979
to pay for the repairs at issue.  Dollar would prevail on the same evidence if
the Lease was found to be ambiguous, and Dollar was forced to rely on extrinsic
evidence to show that the landlord was required to make the repairs. 





[31]  Dollar has sought to recover these fees only on the
ground that the legal fees it incurred for all claims and counterclaims in the
case are inextricably intertwined with its breach of contract claim.  Dollar
has never contended that attorneys=
fees incurred solely to prosecute a claim for breach of the implied warranty of
suitability are independently recoverable under section 38.001(8) of the Civil
Practices and Remedies Code, nor do we find this to be the case.  See,
e.g., Parkway Co. v. Woodruff, 901 S.W.2d 434, 440 (Tex. 1995)
(noting that implied warranties are not statutory, but are judicially created);
Sw. Bell Tel. Co. v. FDP Corp., 811 S.W.2d 572, 576 (Tex. 1991) (op. on
reh=g) (noting that the UCC treats breach of contract and
breach of warranty as different claims having different remedies); Garcia v.
Tex. Instruments, Inc., 610 S.W.2d 456, 463 (Tex. 1980) (acknowledging
previous statements by the Court when considering common-law remedies that Aan implied warranty arising from sales sounds in tort
and not in contract.@); Humber v. Morton, 426 S.W.2d 554, 556
(Tex. 1968) (suggesting that breach of the implied warranty of habitability,
from which the warranty of suitability is derived, is an action in tort rather
than in contract); Harris Packaging Corp. v. Baker Concrete Constr. Co.,
982 S.W.2d 62, 69 (Tex. App.CHouston [1st
Dist.] 1998, pet. denied) (noting that provisions in the Texas Deceptive Trade
Practices Act permitting recovery of attorneys=fees for implied warranty claims for actions brought under the statute
would be meaningless if one could recover attorneys= fees in the absence of the statute); Kerrville
HRH, Inc. v. City of Kerrville, 803 S.W.2d 377, 385 (Tex. App.CSan Antonio 1990, writ denied) (noting that breach of
the implied warranty of suitability is a common-law cause of action, but
addressing only the amount of attorneys=
fees awarded and not the entitlement to attorneys= fees); Momax, LLC v. Rockland Corp., Nos. 05-11364 &
06-10583, 2007 WL 837126, at *1 (5th Cir. March 16, 2007) (per curiam) (slip
op.) (not designated for publication) (refusing to award attorneys= fees on claims of breach of unspecified implied
warranties under Texas Civil Practice and Remedies Code ' 38.001 because doing so would controvert Aa substantial body of Texas caselaw@).

We are mindful of the large body of
caselaw stating that an implied warranty becomes part of the terms of a
contract.  See, e.g., Parkway, 901 S.W.2d at 439 (quoting Arthur Biddle, A Treatise on the Law of
Warranties in the Sale of Chattels 1 (Philadelphia, Kay & Brother
1884)); Certain-Teed Prods. Corp. v. Bell, 422 S.W.2d 719, 721 (Tex.
1968) (stating that Aa warranty which the law implies from the existence of
a written contract is as much a part of the writing as the express terms of the
contract@); Lee v. Perez, 120 S.W.3d 463, 468 (Tex. App.CHouston [14th Dist.] 2003, no pet.) (stating that an
implied warranty Ais part of the contract itself.@); W. Tank & Steel Corp. v. Gandy, 385
S.W.2d 406, 409 (Tex. Civ. App.CTexarkana 1964,
no writ) (AWarranty, either express or implied, must grow out of
contractual relations between the parties.@). 
Here, however, Dollar has never contended that the prosecution of its claim for
breach of the implied warranty of suitability is a claim Afor an oral or written contract@ such that attorneys= fees are recoverable for legal fees incurred solely for its
prosecution.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 38.001(8)
(Vernon 1997); see also Lee, 120 S.W.3d at 468 n.18 (upholding
the award of attorneys= fees for breach of contract because the landlord
breached the implied warranty of suitability and the terms of the lease defined
a default by the landlord to include a breach of a warranty); Altz v.
Leiberson, 134 N.E. 703, 17B19 (N.Y. 1922)
(in perhaps the earliest case recognizing the implied warranty of habitability,
J. Cardozo applied reasoning most closely akin to negligence or negligence per
se, without distinguishing contract law); 2 Richard
R. Powell, Powell on Real Property ' 16B.08[2][e]
(Michael Allan Wolf, ed., 2005) (discussing the roots in negligence law of the
tort claim of breach of the implied warranty of habitability, from which the
implied warranty of suitability is derived).